IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KATHLEEN HARDY,

        Plaintiff,

v.                                    Civil Action No. 5:09-CV-112

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    Background

    Plaintiff, Kathleen Hardy (Claimant), filed a Complaint on October 9, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on April 5,

2010.[2]  Claimant filed her Motion for Summary Judgment on May 5, 2010.[3]  Commissioner filed

his Motion for Summary Judgment on June 3, 2010.[4]

B.    The Pleadings

    1.    Claimant's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 16.

[4] Docket No. 18.

2.    Defendant's Brief in Support of Motion for Summary Judgment.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED**.  The ALJ did not err by relying on the opinion of Claimant's treating physician Dr. Jones or by failing to include any limitation on concentration, persistence, or pace in the RFC despite finding that Claimant had moderate difficulties maintaining concentration, persistence, and pace.  However, the ALJ erred by failing to specifically explain his reasoning for discrediting the opinions of Claimant's treating physician when determining Claimant's RFC and by failing to comply with 20 C.F.R. § 416.920a and SSR 96-8p, which required that he assess in detail by itemizing various functions Claimant's rate of functional limitations using her activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation.

2.    Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income (SSI) on May 15, 2007, alleging disability due to arthritis in her knees, asthma, and hepatitis C beginning April 1, 2006. (Tr. 97-99, 107).  The claim was denied initially on August 14, 2007, and upon reconsideration on October 4, 2007.  (Tr. 51-55 & 58-60).  Claimant filed a written request for a hearing on November 19, 2007.  (Tr. 61).  Claimant's request was granted and a hearing was held on

October 22, 2008, during which the onset date was amended to April 11, 2007.  (Tr. 18-48).

The ALJ issued an unfavorable decision on December 5, 2008.  (Tr. 5-17).  The ALJ determined Claimant had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 416.925 and 416.926), Claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) with certain exceptions, and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 416.969 and 416.969a).  (Tr. 11-16).  Claimant filed a request for review of that determination on January 12, 2009, and the request for review was denied by the Appeals Council on August 6, 2009.  (Tr. 95, 1-4).  Therefore, on August 6, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on January 21, 1964, and was forty-three (43) years old as of the amended onset date of her alleged disability and forty-four (44) as of the date of the ALJ's decision.  (Tr. 97).  Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009).  Claimant achieved a GED and has previous work experience as a cashier, packer, and telemarketer.  (Tr. 108, 111).

C.      Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**<u>Treatment Records, Dr. Bonfili, Jefferson Primary Care, 2/27/06 - 7/28/07 (Tr. 143 - 48 & 166-71)</u>**

<u>2/27/06</u>
- chief complaint: seen as new patient - feet swelling, Hepatitis C, mmm
- physical exam: healthy appearing; no distress; regular cardiac rhythm; no murmurs, rubs, or gallops; anxious
- assessment/plan:
 - 491.21 obstructive chronic bronchitis with acute exacerba - medications
 - 716.9 unspecified arthropathy - medications
 - 070.54 chronic hepatitis C without mention of hepatic com
 - 782.3 edema
 - 300.00 anxiety state, unspecified - medications

<u>5/1/06</u>
- chief complaint: follow-up evaluation
- physical exam: healthy appearing in no distress
- assessment/plan:
 - 070.54 chronic hepatitis C without mention of hepatic com - refer to gastroenterologist
 - 716.9 unspecified arthropathy - oxycontin

<u>8/28/06</u>
- chief complaint: follow-up evaluation
- physical exam: normal body habitus; judgment appropriate; oriented; normal memory; mood and affect appropriate
- assessment/plan:
 - 491.21 obstructive chronic bronchitis with acute exacerba - medications
 - 716.9 unspecified arthropathy - medications

<u>12/28/06</u>
- chief complaint: joint pain
- physical exam: healthy appearance; no distress; trochanteric bursa tenderness; tender sciatic notch
- assessment/plan:
 - 716.9 unspecified arthropathy - oxycontin

<u>5/31/07</u>
- chief complaint: follow-up evaluation
- physical exam: healthy appearance; no distress; decreased breathing sounds bilaterally
- assessment/plan:
 - 491.21 obstructive chronic bronchitis with acute exacerba - medications
 - 724.5 unspecified backache - hydrocodone; oxycontin

<u>7/28/07</u>

- chief complaint: follow-up
- physical examination: healthy appearance; no distress; clear to auscultation and percussion; normal respiratory effort; no fremitus
- assessment/plan:
- 491/21: obstructive chronic bronchitis with acute exacerba - medication
- 724.5: unspecified backache - hydrocodone; xanax; oxycontin
- 250.00 - type II (non-insulin dependent type) or unspecified

**Physical Examination, Dr. Bonfili, Jefferson Primary Care, 6/4/07 (Tr. 150-54)**
- symptoms/ signs: abnormal gait - uses cane; normal gross motor ability; abnormal joint - LLE and RLE ROM decrease flexion, extension; abnormal breathing sounds - some wheezing; trace BLE; obese
- medical source statement: difficulty standing or sitting greater than 2 hours due to knee and back pain; significant respiratory issues with exertion and outdoor activities; cannot deal with stressful situations

**Consultative Examination Report, Dr. Nutter, Tri State Occupational: Martinsburg, 7/18/07 (Tr. 155-64)**
- chief complaint: shortness of breath
- review of systems:
- cardiovascular: claimant reports edema; denies chest pain
- gastrointestinal: claimant reports abdominal pain, nausea; denies hematochezia, vomiting
- other: reports headaches occurring 3 times/week; neck pain; joint pain - hands, right hip, knees
- general: ambulates with normal gait; does not require a handheld assistive device; appears stable at station and comfortable in supine position and comfortable in sitting position; intellectual functioning seems normal throughout examination
- chest: inspiratory phase of respiration is decreased; mild dyspnea with mild exertion; no dyspnea when lying flat; breathing is shallow and fast; with coughing there was a slight increase in inspiration with coughing and air movement did not seem significantly decreased; lungs sounded tight when coughing; lungs clear to auscultation with no rubs, wheezes, rales, or rhonchi noted; chest is clear to percussion; no clubbing; no cyanosis
- cardiovascular: regular heart rate; no murmurs, gallop, rubs, or clicks; varicosities absent; no ulcers; no edema present bilateral lower extremities
- upper extremities: right knee shows evidence of pain with movement and tenderness; no redness warmth, swelling, tenderness, crepitus, or laxity in rest of upper extremity joints
- lower extremities: right knee shows evidence of pain with movement and tenderness; medial aspect of left knee shows evidence of tenderness and bony enlargement; left knee shows evidence of pain with movement; no tenderness, redness, warmth, swelling, crepitus, or laxity in the rest of the lower extremity joints
- cervical spine: pain with ROM testing; no paravertebral spasm in cervical spine
- impression: asthma and emphysema; chronic cervical strain - no evidence of radiculopathy; degenerative arthritis

**Mental Status Examination, Harold Slaughter, West Virginia Disability Determination Service, 8/2/07 (Tr. 173-76)**

- chief complaints: asthma, hepatitis C, arthritis, and diabetes
- presenting symptoms: disturbed sleep mainly due to arthritis and asthma; satisfactory appetite; no suicidal ideation; no phobias; no panic attacks; no compulsions; generalized anxiety symptoms; generalized depressed mood
- mental status exam: cooperative; no speech impediment; oriented in all spheres; appropriate mood; broad affect; thought process within normal limits; coherent and relevant thought content; average judgment; immediate memory within normal limits; remote memory within normal limits; average concentration; persistence within normal limits
- diagnosis:

| | | |
|---|---|---|
| - Axis I | 309.28 | adjustment disorder with mixed anxiety and depressed mood |
| - Axis II | V71.09 | no diagnosis |
| - Axis III | | claimant reports asthma, hepatitis C, arthritis, and diabetes |

- prognosis: good with continued treatment
- capability: capable of handling own finances


**Psychiatric Review Technique, Frank Roman, 8/10/07 (Tr. 179-92)**

- medical disposition: impairment(s) not severe
- categories upon which medical disposition is based:
    - 12.04 affective disorders - adjustment DO with depressed mood
    - 12.06 anxiety-related disorders - adjustment DO with anxiety
- functional limitations:
    - restriction of activities of daily living: mild
    - difficulties in maintaining social functioning: mild
    - difficulties in maintaining concentration, persistence, or pace: mild
    - episodes of decompensation, each of extended duration: none
- evidence does not establish C criteria for 12.04 or 12.06
- notes: based on MER, claimant is credible and remains capable; impairment is non-severe; restrictions appear to be due mainly to physical concerns


**Physical Residual Functional Capacity Assessment, Dr. Franyutti, 8/13/07 (Tr. 193-200)**

- primary diagnosis: moderate COPD, asthmatic B
- secondary diagnosis: arthritis of neck, back, hips, knees
- other alleged impairments: hx. of hepatitis, headaches, obesity

Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited

Postural Limitations
- climbing ramp/stairs: occasionally

- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
<u>Manipulative Limitations</u>: none
<u>Visual Limitations</u>: none
<u>Communicative Limitations</u>: none
<u>Environmental Limitations</u>:
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
- hazards: avoid concentrated exposure
<u>Notes</u>: claimant appears to be partially credible; allegations partially supported by findings

**Medical Evaluation/ Case Analysis, Philip Comer, Ph.D, 10/3/07 (Tr. 264)**
- reviewed evidence in file and assessment of 8/10/07 is affirmed

**Treatment Notes, Robert Jones, M.D., 11/15/07 - 9/22/08 (Tr. 213-52)**
11/15/07 New Patient Evaluation
- subjective: hepatitis C, asthma, endometriosis, degenerative arthritis of knees, type II DM, HTN, hyperlipidemia
- objective: well appearing, well-nourished; no distress; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular rate and rhythm; no murmur or gallop; spine normal without deformity or tenderness; no CVA tenderness; no extremity deformities
- assessment: hypertension NOS - 401.9; hyperlipidemia other and unspecified - 272.4; DM II controlled - 250.00; asthma NOS - 493.90; anxiety state unspecified - 300.00; hepatitis C - V02.62
- plan: medication and patient education - smoking counseling
12/14/07
- follow-up of Type II DM
- subjective: visual disturbance; number fingertips; legs stinging in the shower
- objective: well-appearing; well-nourished; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular heart rate and rhythm; no heart murmurs or gallops; intact recent and remote memory, judgment, and insight; normal mood and affect
- assessment:
      - diagnosis:  chronic hepatitis C: 571.49
      - major problems: hypertension benign 401.1; diab uncomp Type II; mixed
      hyperlipidemia 272.2

- plan: refer to UVA for hepatitis treatment; diet and exercise counseling

<u>1/31/08</u>
- subjective: knee pain
- objective: well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; knee effusion
- assessment: knee pain due to sprain lateral coll lig - 844.0

<u>2/7/08 MRI Exam</u>
- impression:
      - suspect tear of lateral retinaculum, with abnormal lateral subluxation of the patella
      - moderate joint effusion
      - equivocal, horizontal tear in anterior horn of lateral meniscus

<u>2/29/08</u>
- follow-up hepatitis C and knee pain
- subjective: knee pain - right
- objective: well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular heart rhythm and rate; no heart murmurs or gallops; lungs clear to auscultation and percussion
- assessment: other derangement of knee; chronic hepatitis

<u>3/27/08</u>
- check-up hepatitis C; pain to left knee; scheduled for knee surgery
- subjective: knee pain in both
- objective:  well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular heart rhythm and rate; no heart murmurs or gallops; lungs clear to auscultation and percussion
- assessment: chronic hepatitis; int derangement knee OT

<u>4/22/08</u>
- follow-up of knee pain after surgery - arthroscopic surgery on 3/28
- subjective: still having knee pain - left
- objective: normal except in obvious pain; extremities are normal except for healing incision to left knee; edema to knee limited ROM with flexion
- diagnosis: int derangement knee OT
- plan: increase oxycontin

<u>6/23/08</u>
- subjective: son died 3 weeks ago; depressed; anxiety
- objective: well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular heart rhythm and rate; no heart murmurs or gallops; lungs clear to auscultation and percussion
- assessment: anxiety state unspecified - 300.00; diabetes uncompl type II - 250.00

<u>7/21/08</u>
- interim medical examination
- subjective: left knee tender; anxiousness
- objective: well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; no

cardiomegaly or thrills; regular heart rhythm and rate; no heart murmurs or gallops; lungs clear to auscultation and percussion
- assessment: hepatitis C - V02.62; anxiety states - 300.00; diabetes uncompl type II - 250.00
9/22/08
- follow-up of NIDDM
- subjective: diabetes; left knee pain
- objective: well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; well-appearing; well-nourished; no distress; oriented x3; normal mood and affect; no cardiomegaly or thrills; regular heart rhythm and rate; no heart murmurs or gallops; lungs clear to auscultation and percussion; normal gait and station; DTRs normal in upper and lower extremities
- assessment: DM controlled - 250.00

**Emergency Room Note, Melinda Morris PA-C, City Hospital, 1/21/08 (Tr. 203-04)**
- chief complaint: knee pain
- general: no acute distress
- extremities: no swelling in knee; full range of motion with exception fo decreased flexion due to patient guarding with pain; palpable clicking with McMurray's and flexion; negative anterior and posterior drawer sign; no ligament laxity
- impression: osteoarthritis, left knee

**Treatment Records, Dr. Draper, 2/20/08 - 8/26/08 (Tr. 208-12)**
2/20/08
- chief complaint: pain in left knee
- physical exam: 5'5" and weighs 195 lbs; no definite effusion in knee but it is a little puffier than the right knee
- medical decision: patellofemoral arthritis left knee
- plan: offered corticosteroid injection but she preferred to try something else
3/5/08
- patient fell and landed on right knee; left knee still hurting
- physical exam: right knee is puffy but there is no gross effusion; lot of crepitus in the right knee but no instability to anterior, posterior, or varus/valgus stress
- medical decision: contusion right knee; patellofemoral arthritis of left knee
- plan: decided to arthroscope the left knee
4/9/08
- walking with cane; knee is swollen but portals are all well healed; given exercises to do for knee
- plan: take celebrex in spite of Hepatitis C
5/8/08
- doing better but still having some lateral pain (possibly related to tourniquet or irritation of the peroneal nerve); swelling down; sounds more like neuropathic pain; working on exercises
- plan: try Lyrica
5/22/08
- right knee feels good; effusion in left knee; refuses to think about aspirating and injecting the

knee because she is afraid of needles although she has tattoos
- plan: given samples of celebrex
6/12/08: no show
8/26/08:
- lots of pain in left knee
- medical decision: osteoarthritis left knee
- plan: gave information on knee replacements


**Operative Note, Dr. Draper, WVUE-City Hospital, 3/28/08 (Tr. 205-06)**
- preoperative diagnosis: internal derangement - left knee; right knee pain
- postoperative diagnosis: large medial synovial shelf, multiple loose bodies and grade IV
chondromalacia of the patellofemoral joint, left knee; painful right knee


**Physical Residual Functional Capacity Assessment, Dr. Lateef, 10/2/08 (Tr. 256-63)**
- primary diagnosis: chronic pain, back pain
- secondary diagnosis: COPD
- other alleged impairments: hepatitis C
Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited
Postural Limitations
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
- hazards: avoid all exposure
Notes: smoker with COPD, hepatitis C and chronic pain; RFC reduced to light with postural and

environmental limitations

**Physical Residual Functional Capacity Questionnaire, Dr. Draper, 10/16/08 (Tr. 253-55)**
- diagnosis: osteoarthritis of both knees
- prognosis: knees will gradually get worse; at point to consider left knee replacement
- symptoms: pain and grinding in both knees - left worse than right; intermittent swelling; pain at night interfering with sleep
- clinical findings: limited motion in left knee; some deformity of left knee
- response to medication: some response to corticosteroid injection and arthroscopic cleaning of left knee - temporary
- psychological conditions: anxiety
- breaks/hour: once every hour for 5- 10 minutes to stretch/change positions
- functional limitations:
  - walk 3-4 city blocks without rest
  - can sit for 30-45 minutes before needing to stand to stretch
  - can sit and stand/walk for about 2 hours each day - need to change positions frequently
  - weight:
    - less than 10 pounds: frequently
    - 10 pounds: occasionally
    - 20 pounds: never
    - 50 pounds: never
  - can grasp, push and pull controls, and use feet for pushing and pulling of leg controls

D.    Testimonial Evidence

Testimony was taken at the hearing held on October 22, 2008.  The following portions of

the testimony are relevant to the disposition of the case:

OPENING STATEMENT BY ADMINISTRATIVE LAW JUDGE:

ALJ    SSI only?  DIB?  I mean, SSI only application, April 11, '07, but I have an onset date of April 1, '06?
ATTY Yes.  The appropriate onset, Your Honor, would be April 11, 2007 - -
ALJ    Amends - -
ATTY - - and we would like to amend that date.
                        *                *                *
ALJ    Counsel, a younger individual, GED.  She's been a cashier at a 7-Eleven.  She's been a packer, briefly, in '06, '05.  She worked telemarketing for a little bit, too.  Do you have a theory of the case?
                        *                *                *
EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:
Q       Are you married?
A       I'm separated.

11

Q Do you live with anyone?

A Yes, sir.  I do.  I live with my nephew and two sons.

Q Your two sons?

A Yes, sir.

Q Ages?

A 25 and 20 and the  nephew is 26.

Q Okay.  Are any of them on disability?

A Yes.  My nephew is.

Q What's his disability?

A He's not - - he was in a car accident and it left him mentally impaired.

Q Mental.  Okay.  Do you have a driver's license?

A Yes, sir.  I do.

Q How often do you drive?

A Once a week.

Q Okay.  Do you have a handicapped sticker, placard or - -

A Yes.  I do.

Q Sticker.  Are you still smoking a pack a day?

A A little less than that but some days when, you know, I'm having a bad day, I'll smoke a little bit more.

Q Okay.  I'm trying to pull up your earnings record.  Did you do a job - - how long did you work at the telemarketing job?

A That wasn't very long, a month maybe.

Q Okay.  One month.  What year was that?

A Five or six years ago or - -

*   *   *

Q Ma'am, I'm going to ask you some more questions.  Your counsel talked about some musculosketal problems - - the neck, the knees.  Do you wear a brace or orthopedic appliance anywhere on your body?

A Yes, sir.  I wear a brace on my knee and I walk with a cane.

Q Which knee?

A The left knee.

Q Left knee.  Do you use it daily?

A Yes.  I do.

Q Okay.  Go ahead.

A I have to use my cane when I walk and things.  If I stand too long - -

Q Is that cane by prescription?

A No.  I went and got it after I had my surgery done, yet my doctor told me to go get one.  He didn't write me a prescription for it.  I bought it myself.

Q Okay.  I have you 5'5" and what's your weight?

A 189 pounds.

Q Okay.  That's about - - okay.  I guess I had you, earlier, at 195 and then you were 175?

A Yeah.

Q You're kind of like in the middle now.

12

A Okay.

Q All right.  Are you under a weight loss program to take pressure off your knee?

A No.  I'm not.

Q Okay.  Have you received steroid injections, cortisone shots, nerve blocks since April '07?

A Yes.  Dr. Draper gave me a pain shot in my left knee last month when I was there - -

Q Okay.

A - - on the 24th.

      *      *      *

Q How long has he been a treating source?  How long has he been your doctor?

A My family physician referred him.  I'm not quite sure what's the first date.  Mr. Mathis –

Q Well, he says covers the period beginning February 20 of '08, so he's - -

A That sounds about right.

Q Okay.  And how often do you see him?

A Well, after he did the surgery and everything and told me that he could do no more and I needed a knee replacement and I told him I - -

Q Have you had the knee replacement or - -

A No, sir.  I told him I needed to go talk to my family about it.  So I went and talked to my family and I made another appointment, which that was the 24th appointment, and - - last month, and him and I discussed it and he said at my age  - -

Q No.  They don't want to do it.

A Exactly.  He said because he would have to, in 10 to 15 years, put - - redo it again.  He said he's usually doing this to 60-year-old women.  So we kind of left it at let it just grind away until it's gone and then we'll put the knee replacement in then and hope it's been long enough where I don't have to have a second one done.

Q Okay.  Have you been, besides a knee replacement, do you need surgery on any other part of your body?

A Yes, sir.  He was thinking of doing something with the right knee, too, doing - -

Q I thought - - we're talking about the left and the right knee?

A Yeah.  We can't do nothing with the right knee while the left knee is like it is.  You know, the - -

Q Which is worse?  The right or the left?

A The left.  That's why we went with the left first.

Q Okay.  So, let's assume here for discussion purposes, you're reduced to a sedentary job.  What would prevent you from answering a phone all day?

A Sir, I find myself fatigue a lot.  Three, maybe four days out of the week, it's just - - I just barely - - I stay in my pajamas.  I just don't have no energy.

Q Do you leave the house now?

A No.

Q Is that because of depression, fatigue or no where to go or what?

A That's fatigue and depression, too.

Q All right.  For your asthma, are you using a nebulizer?

A       Yes, when needed.

Q       How often is that?

A       Well, the last two weeks, I've been using it but I had a really bad cold and congestion in my chest.

Q       Okay.  But how often do you normally use it?

A       About two, three times a week.

Q       Okay.  Your apartment, is it first floor or do you have to go up steps?

A       No.  It's first floor.

Q       Okay.  Let me ask some questions about day-to-day life.  Can you dress yourself head-to-toe?

A       It takes me awhile but, yeah, I can get it done.

Q       Uh-huh.  But slow.  Do you do any housework?

A       I wash dishes.  I put dishes away - -

Q       Uh-huh.

A       - - and I cook and I have hardwood floors in my home and my boys keep my floors scrubbed and, of course, the bathroom because I can't get down to the bathtub and I feather dust and they take the polish rag for me - -

Q       Can you do your own laundry?

A       I can get somebody to carry it to the laundry room for me - -

Q       Okay.

A       - - and I can put it in the washer and then into the dryer and then they carry it back on to my bed for me.

Q       How are you spending your day?

A       It just - - sir, it all depends on what kind of day I'm having, if I'm feeling well or - -

                              *                  *                  *

Q       Where you stay in your PJs.  On those days - -

A       In my bedroom.

Q       Will you keep a doctor's appointment on a bad day?

A       It just all depends on how bad a day it is - -

Q       Well - -

A       - - honestly.  If it's a super bad day and I'm feeling really - -

Q       Well, let's clarify super bad days.  Are they more than once a month?

A       Yes.

Q       How often are your super bad days?

A       At least five to six a month.

Q       On these bad days, do you get dressed?

A       No.

Q       No.  Will you eat?

A       Yeah.  My sons will make me a sandwich or soup or something.  I won't go out there and make it myself.

Q       On a bad day, super bad day, are you confined to your room?

A       Yes.  I don't come out except to use the restroom.

Q       Will you answer the phone on a bad - - on one of those days?

A      No.

Q      Will you keep a social engagement?

A      No.

*        *        *

Q      Okay.  So, from an exertional standpoint, do you have any problems just sitting down?

A      Yeah.  When I'm setting, there's a muscle across the top of my knee.  It will draw up real tight.

Q      So how long can you sit?

A      Like sometimes it will happen, I can sit for an hour and then it will happen or my knee will like lock up - -

Q      So knee?

A      - - and I got to get up and I got to walk, kind of walk it off - -

Q      Okay.

A      - - and then, other times, it might be, you know, 20 minutes to ½ hour and it will happen.  I can't even get a whole nights sleep without it happening.

Q      Okay.  We'll get to that shortly.  How long can you stand?

A      Without anything?  My cane or anything or just stand with my - - whatever?

Q      Well, to make it irrelevant, I try to make it relevant for this area so let's say you have a winning ticket at the race track, over here at Charleston - -

A      Yeah.  I live close to it.

Q      - - and you want to go home - -

A      Right.

Q      - - but there's a long line to cash in your - -

A      No.

Q      How long will you wait?

A      I won't wait.

Q      Okay.  How long will you wait at a grocery store to check out before you abandon the line and walk out?

A      10 minutes, tops.

Q      10 minutes.  And is knee pain?

A      Yes, from standing.  And I don't go to the grocery store by myself because, once my cart gets so heavy, I can't push it no more so I have to take my son with me to - -

Q      Okay.  Do you - -

A      - - push it.

Q      - - use the motorized cart?

A      No.  Because the basket isn't big enough to put my groceries in - -

Q      Okay.  How long -  -

A      - - and I hold on to the cart.

Q      - - can you walk?  Let's get you back to the grocery store again.   How long can you walk?

A      I make it about halfway through the store and then I'll give my son my list and tell him to finish up when I get close to the dairy products.  That's where I know he's not going to mess anything up.

Q      So how long can you walk before you have to head back out to the car?  Because you told me - -

A      Probably about - -

Q      - - you have a sticker.

A      - - ½ hour through the store.

Q      30 minutes.  In terms of lifting and carrying, can you lift a gallon of milk?

A      Yeah.

Q      Do you have any side effects from any medication?

A      No.

Q      How often are you visiting a doctor for your physical ailments?

A      Every month.

                    *              *              *

Q      And when you go to the doctor's office, what are you telling him?  I'm fatigued?  My knee hurts?  I've got - - what complaints do you generally talk about?

A      It's usually lab work about my sugar diabetes - -

Q      Do you know what your blood sugars are running?

A      They're running high the last two months.

Q      What are they?

A      He told me the month before was 180 and they pricked my finger yesterday when I was in there and I'm not sure what quite she said it was.

Q      Okay.  So you don't stick yourself?

A      No.

Q      Do you know if he's got, you got any end organ damage to the nervous system, numbness, tingling of the legs, feet, hands?

A      Yeah.  Now, my left hand and my right, also, and I didn't know that had anything to do with - - I didn't tell him about that.  I forget which hand it was but, a few days back, my whole hand was, it was my left one, because it scared me - -

Q      Okay.

A      - - and my left hand, yeah, almost my whole hand got numb.

Q      Any blurred vision?

A      Yeah.  I just got new glasses.

Q      Okay.  Well, that - - a diabetic - -

A      I didn't have any glasses before.  I just had to go get some.  The Lion's Club paid for them for me.

Q      Okay.  Do you have any problems gripping and grasping?

A      No.

                    *              *              *

Q      Can you take a tub bath?

A      No.

Q      Can you bend down and pick up clothing from a floor?

A      Yeah, with difficulty.

Q      Okay.  Earlier, you said you have no side effects from medication.  I have you on oxycodone or OxyContin.

A      Yes.

Q        Are you on either one of them?

A        Yes.

Q        Okay.  How much?

A        I take three OxyContins a day and two oxycodones a day.

Q        Do you know what the milligram is?

A        40 for the OxyContin and 5 for the oxycodone.

Q        Does it relieve the pain?

A        To a certain extent.  I've been on it so long, you know, it's like it just kind of dulls it now.

Q        All right.  How would you rate your pain and let's go through the joints?  The knees?  On a scale of zero to 10, zero is no pain, 10 is excruciating, exquisite, you can't even carry on a conversation.

A        I'd say seven, even with the medicine.

Q        With the knees, with medication?

A        Yes.

Q        Okay.  On these days that you were staying in - - three to four days a week, you're staying inside, in your PJs, is your pain level higher on those days?

A        Some days, it's lower, some days, it's higher.  I can't say it's - -

Q        Okay.  What is it that keeps you - - you said because of painful joints - - well, what is it that keeps you where you won't dress?  Are you in a depressed mood?  Are you in so much pain that you couldn't, wouldn't leave the house?

A        Well, it's a little bit of both.  It's the pain but it's got a lot of depression to do with it, too.  I was already depressed before my son passed away and that just made it, you know, that much worse and I haven't been able to pull myself together.

Q        Okay.

                    *                    *                    *

Q        All right.  Have you ever had any psychiatric hospitalizations?

A        No.

Q        Is your depression - - do you have depression?

A        Yes, sir.  I believe I do.

Q        Is it reactive to your physical condition or has it lingered all your life?

A        I think it's my physical condition and my life, both.

Q        Okay.  How many  - - you said that you're separated.  How many times have you been married?

A        Just once.

Q        Time one.  Do you have much contact with the husband?  Do you have any - - this is an SSI claim - - do you have any child, I mean, support?

A        My children.

Q        Any financial support from your separated husband?

A        No.

Q        Okay.  And you live in an apartment.  Who is paying for the apartment?

A        My children and my nephew.

Q        Oh, yeah.  They're in there with you.  I'm so sorry.

A        Thank God for them.

Q       Do you go to church or belong to any social organizations or support groups?
A       No, sir.  I don't.
Q       Okay.
A       I don't go anywhere but to the grocery store and doctor.
Q       Any recreational activities, sewing, board games, bingo?
A       Nothing.
Q       Do you do any reading?
A       I pick up my Bible from time-to-time.
Q       Okay.  How long can you read a Bible, read in the Bible?
A       Until my eyes get tired of reading or - -
Q       Okay.
A       - - I need to get up - -
Q       Is like 10 minutes, ½ hour or what?
A       Say 20 minutes to ½ hour.
Q       Okay.
A       And that's only if I got, I'm in my recliner and have my leg elevated up.
Q       Are you on Xanax, too?
A       Yes, sir.
Q       1 milligram?
A       Yes, sir.
Q       How often do you take that?
A       Twice a day.
Q       2 milligrams a day.  Is that - - does that leave you a little bit relaxed, spacey?
A       No.  Honestly, sir, I'll tell you what, I don't think it's enough.  My mind just feels like, all the time, it's just going shoo, shoo, shoo, all different kinds of - - the divorce, the split up, you know, the kids.
Q       Is it - - has the divorce been formally filed?
A       No.  I don't have the money to do it.
Q       Okay.  DDS, I think, gave her a light RFC.  Is your blood pressure under control?
A       No.  It was high when I was there yesterday.
Q       Okay.  Are you compliant with these medications as prescribed?  Are you taking them as directed?
A       Yes, all those medicines.
                        *                *                *
EXAMINATION OF CLAIMANT BY ATTORNEY:
Q       Ms. Hardy, you said that you - - that when you read, you'll only read for 20 to 30 minutes if reclined, with your leg elevated.
A       Correct.
Q       Now, what's that all about?  Why do you need to elevate your leg?
A       Because, as you can see the way I'm setting now, I can't set and bend my knee to a chair like normally would do.
Q       Okay.
A       I have to stretch it out and that's very uncomfortable to try to read like that and, when I lean back in the recliner, if it's stretched straight out, I feel pain on the left side of my

kneecap so I figured out if I elevate it, you know, make the chair go back a little bit and the bottom elevated a little bit, that helps out.

Q       How often do you elevate your leg?

A       Oh, at least two to three hours a day.

Q       What happens if you don't do it?

A       It will swell up like a balloon.

ALJ       Have you ever tried the compression stockings?

CLMT       Yes.  I have.  Dr. Draper gave me some.

ALJ       Help?

CLMT       He changed me to the brace, the knee brace so I guess he thought it didn't.  I, myself, I couldn't tell no difference whether it was on or not.

*                    *                    *

BY ATTORNEY:

Q       Is that the knee brace you're wearing today?

A       Yes, sir.

Q       The one the doctor prescribed?

A       Yes.

Q       Do you wear that all the time?

A       Yes, except in the shower, of course.

Q       How long have you been using that cane you have?

A       Ever since the surgery.

Q       Now, I understand you have fluid and swelling in your knee.  Is it obvious?   Can you feel it?

A       Oh, yeah.   That's what I'm saying, it just gets tight, real, real tight in there.

Q       It gets so swollen, the skin gets tight?

A       Yeah.

Q       Now, let's talk about if you had some kind of sedentary job, answering the phone, would you have to elevate your leg during the day?

A       Oh, most definitely.

Q       And tell me again, how high do you have to get your foot?

*                    *                    *

A       All right.  It stays on an angle like that.

Q       So your knee and foot would actually be above hip level?

A       Exactly.

Q       Okay.  Do you use ice?

A       Occasionally and a heating pad occasionally.  I'm trying to figure out which one will help the best.  And the colder weather is just making it really ache, ache, ache.

*                    *                    *

Q       Do you get short of breath?

A       Oh, yes.

*                    *                    *

Q       Just a little more clarification about the amount of fatigue you have.  Give me an example of an activity and we could take grocery store, where you have to shop, because you

indicated that the motorized cart doesn't have enough, so when you go, you try and shop for the month?

A Well, at least a week or two, you know, so I don't have to get out as much because it's difficult for me to drive and just - - I just get wore out.

Q Okay.  So - -

A When I get back from the grocery store, I can't even put the groceries away.

Q - - let's do it - - because you have a handicapped sticker?

A Right.

Q Okay.  So you make your list.  You go out to the car.  You drive to the store.  You park in a handicapped place?

A Right.

Q You go in.  You're not using a motorized cart?  You use the push cart?

A Right.

Q You finish the shopping for a month or week or whatever, get back in a car and return back home, from the time you left the house until the time you return, how much time has gone by?

A About an hour, hour, 15 minutes.

Q Okay.  At the end of an hour, hour and a quarter, when you come home, put away the perishables, put down the purse, sit at the kitchen table, head for the bedroom, what is - - what do you do?

A I pop the trunk.  The boys come out and get the groceries and - -

Q You don't bring anything in but your purse?

A I don't carry nothing in but grab my cane and my pocketbook and the boys carry the groceries in and they put them away, too.  I go to my room, either lay in my bed or get in my recliner and prop my leg up.

Q What's your fatigue factor at this point?

A I'm exhausted.  I got to take a nap or I got to sit there and rest.  I'm just totally wore out.

Q Now, let's say you had to repeat the whole thing.

A What, do it again after the first time?

Q Yeah.  How long would you have to  rest before you can do it again?

A Until the next day.

Q Okay.  Counsel, I think he may have mentioned it, but you also have Hepatitis C?

A Yes, sir.

Q Any liver damage?

A Yes.

    *     *     *

Q Most likely, it was contracted 20 plus years ago?

A I have no idea, sir, how I got it.

Q Any blood transfusion, any drug use in the past?

A No.  So, I have no idea how I contracted it.

Q Okay.

A I found out through the Health Department.

(The Vocational Expert, MR. LESTER, having been duly sworn, testified as follows:)

ALJ         Mr. Lester, past relevant work?

VE          Yes, sir. Cashiering work would be light duty, unskilled, packer, medium duty, unskilled, telemarketer, sedentary, semiskilled but I don't believe she kept that position long enough to develop the skills.

     *     *     *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q           Younger individual, has a GED, work history as described with regard to testimony. Due to the fatigue factor, let's limit her to sedentary with the following limitations: Because of the bronchial asthma, minimal exposure to environmental irritants or temperature extremes. Let's keep it unskilled, entry or entry level positions. Because of the knee problems, there would be no squatting, crawling or kneeling.

     *     *     *

Q           What, if any, jobs exist for an individual with those limitations?

A           Sedentary, unskilled work available to such an individual would include administrative support work such as an addresser. There's - - the DOT number is 209.587-010. There's approximately 42,000 such positions in the national economy, some 3,000 in the region, the region being the state of Maryland. Also, adjusting work such as a call-out operator, approximately 45,000 nationally, some 2,000 regionally , and also an interviewing position such as a charge account clerk, DOT number is 205.367-014, approximately 50,000 nationally, 3,000 regionally. I failed to give you the number for the call-out operator. That's 237.367-014. Those are examples of sedentary, unskilled positions that are consistent with the descriptions in the Dictionary of Occupational Titles.

Q           Have you looked at 16F?

A           I have, sir.

Q           What impact, if any, would that have on the ability to do the jobs you mentioned?

A           There would be no work, no full-time work available for such an individual. 16F indicated that they would require a rest period every hour for five to 10 minutes and also sitting would only be allowed two out of eight hours and standing and walking only two out of eight hours.

Q           I lost that. What happened to it? I know you gave it back to me. I can't find it. I got your letter here. I know that. Oh, here it is. No. Oh, here it is. Okay. Arthroscopic, left knee. Back to the vocational expert. I have two - - well, the mental status examination, they diagnosed - - that's 5F - - adjustment disorder and then the physical exam, internal medicine exam of July '07 diagnosed asthma and emphysema, cervical strain. No evidence of radiculopathy. Degenerative arthritis. Okay. Back to the vocational expert. Given the limitations as set forth by her testimony, that reveals three to four bad days a week, but five to six super bad days a month, where she won't dress. She will eat okay. She pretty much is confined to her room. She won't answer the phone nor engage in social activities during these days. A shopping excursion for an hour, hour and ¼, will necessitate rest until the following day. She has a constant level seven knee pain, even with the use of psychotropic medications, I mean, pain relieving medications, including OxyContin and oxycodone, and the use of Xanax, 2 milligrams per day. Given the limitations as set forth by the Claimant's testimony, is that going to impact the ability to do the jobs you mentioned?

21

A        Yes, sir.  I think the absenteeism rate would be beyond what an employer would allow and, over time, that would improve work.

Q        Now what is the employer tolerance?

A        Generally more than what is routinely provided which would be a day, day and ½ to two days per month.

*                    *                    *

ATTY        One question.  If we were to add to the first hypothetical the need to elevate the left leg at hip level or above, two to three hours a day, what impact would that have on sedentary jobs?

VE        The elevation, at that level, if that were required during the workday, it would take one away from - - wouldn't allow one to do the essential functions and take of the job and would preclude, again, preclude work over time due to  loss of productivity.

ALJ        How many hours - - I think I probably asked this question, gets kind of confusing - - she said - - you elevate the leg how many hours?

CLMT        Two to three hours.

ALJ        A day?

CLMT        Yes, sir.

ALJ        Okay.  Two or three hours.  And no jobs?

VE        That's correct, sir.

*                    *                    *

E.        Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- is a smoker (Tr. 24)
- uses a cane (Tr. 25)
- dresses herself (Tr. 28)
- does laundry if someone carries it to the laundry room for her (Tr. 28)
- has no trouble gripping or grasping (Tr. 34)
- can bend down to pick up clothing but has some difficulty (Tr. 34)
- makes coffee (Tr. 113)
- watches television daily (Tr. 113, 117)
- washes dishes (Tr. 28, 113, 115)
- makes the bed (Tr. 113, 115)
- prepares meals daily (Tr. 28, 113, 115)
- does housework (Tr. 28, 113)
- cooks for three adult sons and manages the household bills (Tr. 114)
- can no longer prepare large meals (Tr. 114)

22

- can no longer clean home and do laundry without feeling tired and out of breath (Tr. 114)
- has trouble sleeping when it's too hot (Tr. 114)
- has trouble bending down to tie her shoes (Tr. 114)
- can no longer take baths because she cannot get out of the bathtub (Tr. 34, 114)
- can no longer style her hair (Tr. 114)
- squatting to sit on the toilet is hard on her knees (Tr. 114)
- getting too hot affects her breathing and forces her to rest (Tr. 114)
- does not need reminders to care for her hygiene (Tr. 115)
- does not need reminders to take her medication (Tr. 115)
- dusts (Tr. 28, 115)
- mops floors (Tr. 115)
- does not do yard work (Tr. 116)
- only goes outside when it is necessary because of breathing problems (Tr. 116)
- is able to drive (Tr. 24, 116)
- can go out alone (Tr. 116)
- is able to go grocery shopping but must go with someone because the cart gets too heavy to push (Tr. 32, 116)
- cannot unload her car or put away groceries (Tr. 42)
- is able to pay bills, count change, handle a savings account, and use a checkbook/money order (Tr. 116)
- reads daily (Tr. 37, 117)
- scrapbooks and creates other crafts daily (Tr. 117)
- spends time with others daily - watching movies, playing cards and talking (Tr. 117)
- does not go anywhere regularly except for the grocery store and doctor's office once each month (Tr. 37, 117)
- needs someone to accompany her to the grocery store and doctor's office (Tr. 117)
- has no problems getting along with others (Tr. 118)
- illness affects squatting, standing, walking, kneeling, stair climbing, completing tasks, and concentrating (Tr. 118)
- can only walk 100 yards before needing to rest (Tr. 118)
- is able to finish what she starts (Tr. 118)
- follows written and spoken instructions very well (Tr. 118)
- is able to get along with authority figures well unless she is told to do something she cannot do (Tr. 119)
- handles stress fairly well (Tr. 119)
- handles changes in routine fairly well (Tr. 119)
- numerous references throughout the record to Claimant's obesity

### III. The Motions for Summary Judgment

A.   <u>Contentions of the Parties</u>

Claimant argues that the ALJ erroneously evaluated Claimant's residual functional capacity. Specifically, Claimant argues that the ALJ failed to evaluate pertinent evidence when assessing the RFC; misinterpreted Claimant's treating physician's opinion that Claimant's knee healed; inappropriately relied upon one of Claimant's treating physicians; failed to include any limitation on concentration, persistence, or pace in the RFC assessment despite determining Claimant had moderate difficulties maintaining concentration, persistence, and pace; and failed to comply with SSR 96-8p, which requires the ALJ to perform a more detailed assessment of Claimant's capacity to perform the mental demands of work.

Commissioner contends that the proper inquiry is whether the ALJ's RFC is supported by substantial evidence and argues that it is. Commissioner contends substantial evidence supports the ALJ's RFC assessment because the ALJ cited numerous factors when coming to his RFC determination, properly issued according weight to Claimant's treating physicians, accommodated for Claimant's mental complaints, and evaluated Claimant's activities of daily living in coming to the RFC determination.

B.     Discussion

1.     Whether the ALJ Erred Evaluating Claimant's Residual Functional Capacity.

Claimant argues that the ALJ erroneously evaluated Claimant's RFC. To support this argument, Claimant makes four arguments:

a)     The ALJ failed to properly evaluate pertinent evidence, specifically that his analysis of Dr. Draper's records was insupportable and the ALJ improperly found that Dr. Draper reported Claimant's knee had healed;

b)     The ALJ improperly relied on Claimant's treating physician Dr. Jones because Dr. Jones's treatment notes indicate that he never performed more than a perfunctory exam of Claimant's knees;

    c)     The ALJ failed to include any limitation on concentration, persistence, or pace in the RFC despite finding that Claimant had moderate difficulties maintaining concentration, persistence, and pace; and

    d)     The ALJ failed to comply with SSR 96-8p by performing an inadequate assessment of Claimant's capacity to perform mental demands of work.

Commissioner contends that the proper inquiry is whether substantial evidence supports the ALJ's RFC determination. Commissioner argues that the decision is supported by substantial evidence because the ALJ detailed his reasoning behind his RFC assessment, properly accorded weight to Dr. Draper, accommodated for Claimant's mental complaints, and used Claimant's activities of daily living to support his RFC.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (West 2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Though the Court's review is limited, the Court must still ensure that the ALJ properly followed the law when determining Claimant's disabled status.

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

The ALJ is responsible for determining a claimant's RFC. Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004). The RFC determination must be based on medical evidence. Id. "An ALJ's determination of a claimant's RFC must find support in the medical evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). "Subjective complaints of pain are often central to a determination of a claimant's RFC;" however, "[t]he ALJ may discount subjective complaints 'if there are inconsistences in the evidence as a whole.'" Id. (quoting Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001). Courts reviewing an ALJ's RFC assessment must determine whether the record presents medical evidence of the claimant's RFC at the time of the hearing. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

Claimant first argues that the ALJ erred in his assessment by failing to properly evaluate pertinent evidence, specifically that his analysis of Dr. Draper's records was insupportable.

Claimant argues that there is no indication which opinions the ALJ actually considered or which opinions the ALJ found to be supported by the record. When determining a claimant's RFC, the ALJ is to evaluate the opinions of treating physicians. 20 C.F.R. § 416.945. Here, the ALJ examined the records and reports of Drs. Bonfili, Jones, Nutter, and Draper when assessing Claimant's RFC. Ruling 96-8p mandates that an RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." Reaching the RFC, the ALJ must consider and address medical source opinions. SSR 96-8p. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. When relying on records of treating physicians, the ALJ must articulate specific reasons for rejecting an opinion or explain how the opinions are inconsistent with other medical evidence. Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004).

Claimant argues that the ALJ erred by failing to provide any explanation for implicitly rejecting the opinions of Dr. Draper. The Court must agree. Though the ALJ did not fully reject the opinions of Dr. Draper but decided to accord only some, but not controlling, weight, the ALJ failed to adequately provide specific reasons for failing to give controlling weight. (Tr. 15). In assessing Claimant's RFC, the ALJ noted that Claimant began his treatment with Dr. Draper in February 2008 and Dr. Draper originally placed Claimant on pain medication and corticosteroid injections. (Tr. 14). In March, Dr. Draper diagnosed a right knee contusion and hospitalized Claimant for a corticosteroid injection in the right knee and arthroscopic surgery on the left knee. (Id.). In April, Dr. Draper noted Claimant was using a cane and that her knee was swollen and the surgical site was healed. (Id.). Dr. Draper then gave Claimant exercises to do. (Id.). In May,

Dr. Draper prescribed pain medicine.  (Id.).  Claimant did not see Dr. Draper again until August due to missed appointments at which time Dr. Draper informed Claimant that the only other possibility was knee replacement surgery.  (Id.).

The ALJ limited the weight accorded to Dr. Draper because his conclusions were "not fully supported by his records."  (Tr. 15).  However, the ALJ erred by failing to specifically identify why the conclusions were not fully supported by the records.  The ALJ noted that Dr. Draper's "actual treatment notes through August 2008 (which include three missed appointments) indicated that the claimant's knee had healed since her surgery."  (Id.).  Neither Dr. Draper's records nor the ALJ's opinion supports this statement.  In fact, the ALJ found, when considering Dr. Draper's records, that Claimant's "surgical site was healed" and the knee was still swollen.  (Tr. 14).  This certainly does not stand for the conclusion that Claimant's knee was healed.  Further, the ALJ noted that Dr. Draper's records indicated that Claimant "still complained of left knee pain and limped when she walked" on Claimant's August 26, 2008 visit to Dr. Draper.  (Id.).  These records also do not support the contention that Claimant's knee was healed.  The only other reason offered by the ALJ for limiting the weight of Dr. Draper was that his records did not reflect the need for a cane or other ambulatory assistance or the need to elevate her legs or take frequent rest periods.  (Tr. 15).   This alone is not specific enough nor does it explain how Dr. Draper's opinions are inconsistent with the opinions of other treating physicians. Though the ALJ need not specifically reject and distinguish every finding by a doctor, the ALJ must afford more analysis to specifically identify why less than controlling weight is accorded to a treating physician's medical opinions.

Accordingly, the ALJ erred when evaluating the opinion of Dr. Draper, Claimant's treating physician, for assessing Claimant's RFC. Though this alone requires a remand, the Court will examine Claimant's other arguments in the event that the District Court does not agree with the analysis.

Claimant's second argument is that the ALJ improperly relied on Claimant's treating physician Dr. Jones because Dr. Jones's treatment notes indicate that he never performed more than a perfunctory exam of Claimant's knees. All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b) (West 2010). Every medical opinion is to be evaluated regardless of its source. 20 C.F.R. §§ 404.1527(d). The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). When considering the weight to be given to a treating source, the ALJ is to consider all of the following factors: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. § 404.1527(d).

Therefore, it was not improper for the ALJ to consider and rely upon Dr. Jones. As a treating physician, Dr. Jones's opinion was to be considered by the ALJ. The ALJ then had the opportunity to evaluate the treatment relationship between Dr. Jones and Claimant and determine how much weight to accord to the opinion. This was not an error.

Third, Claimant argues that the ALJ failed to include any limitation on concentration, persistence, or pace in the RFC despite finding that Claimant had moderate difficulties

maintaining concentration, persistence, and pace. At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. 20 C.F.R. § 416.920(a)(4)(ii). If a claimant is found to have an impairment or combination of impairments that is severe and the impairment meets the criteria of a Listing, then the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). However, if the claimant's impairment(s) does not meet a Listing, the ALJ "will assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in [the claimant's] record . . . ." 20 C.F.R. § 416.920(e). An RFC is what a claimant can do despite her limitations. When assessing a claimant's RFC, the ALJ is to consider all claimant's medically determinable impairments. 20 C.F.R. § 416.945(a)(2). It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical conditions. 20 C.F.R. § 416.945(a)(3). Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 416.945(a)(5).

In this case, the ALJ determined that Claimant has the RFC "to perform sedentary work as defined in 10 C.F.R. § 416.967(a) except she cannot crawl, kneel or squat due to knee impairment and pain. Due to her asthma and shortness of breath, she must avoid exposure to

respiratory irritants and temperature extremes. Due to her adjustment disorder with mixed anxiety and depression, and pain, she is capable of understanding, carrying out and remembering only simple instructions." (Tr. 12). The ALJ made this assessment based on several factors including the objective medical evidence as well as Claimant's own testimony.

It is the duty of the ALJ to resolve conflicts in the evidence; whereas it is the duty of this Court to determine whether the Commissioner's findings are supported by substantial evidence. Hayes, 907 F.2d at 1456. In this case, the ALJ's RFC determination was supported by substantial evidence and the ALJ did not err. Based on Claimant's testimony and the objective medical evidence, the ALJ found Claimant suffered from the medically determinable impairment adjustment disorder with mixed anxiety and depression. (Tr. 11). When evaluating whether this impairment met a Listing, the ALJ evaluated the B criteria of Listings 12.04 and 12.06 and determined that Claimant had moderate difficulties maintaining concentration, persistence, and pace. (Id.). The moderate difficulty finding was not a medically determinable impairment but rather a criterion for evaluation under the Listings. Therefore, the ALJ had no obligation to specifically consider Claimant's moderate difficulty maintaining concentration, persistence, and pace. The ALJ's only obligation was to consider the medical evidence that led the ALJ to find Claimant's moderate difficulty, and the ALJ complied. When assessing the RFC, the ALJ reviewed the records of Drs. Bonfili, Jones, and Slaughter. (Tr. 14). Both Drs. Bonfili and Jones prescribed Xanax and Lexapro. (Id.). The ALJ found that Claimant denied any additional mental health treatment when being examined by Dr. Slaughter but reported "disturbed sleep, generalized anxiety, and a generalized depressed mood due to the stresses of her medical conditions and reduced activities." (Id.). Dr. Slaughter reported that Claimant "was well

oriented, had normal thought processes, and exhibited normal or average memory, concentration, and task persistence." (Id.). Dr. Slaughter found her social functioning to be normal but reported that Claimant had restrictions because hot weather exacerbated her asthma. (Id.). The ALJ also noted that Dr. Slaughter "diagnosed an adjustment disorder with mixed anxiety and depressed mood, described her symptoms as mild, and opined that her prognosis was good with continued treatment." (Id.).

The ALJ properly evaluated the medical records as required by 20 C.F.R. § 416.945; therefore, the ALJ did not err.

Finally, Claimant argues that the ALJ failed to comply with SSR 96-8p by performing an inadequate assessment of Claimant's capacity to perform mental demands of work. To evaluate a claimant's mental impairments, the ALJ must comply with the evaluation process set forth in 20 C.F.R. § 416.920a. The ALJ must first evaluate the claimant's symptoms, signs, and laboratory findings to determine if the claimant has a medically determinable mental impairment. 20 C.F.R. § 416.920a(b) (West 2010). Once it is determined that the claimant suffers from a medically determinable mental impairment, the ALJ must specify the symptoms, signs, and laboratory findings that indicate the presence of the mental impairment. Id. Next, the ALJ must rate the degree of the mental limitation. When assessing the functional limitation, the ALJ is to consider "all relevant and available clinical signs and laboratory findings, the effects of [] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. § 416.920a(c)(1). The ALJ is to evaluate the degree of the claimant's functional limitation in four areas: activities of daily living; social functioning; concentration, persistence,

32

or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). SSR 96-8p specifies that this evaluation is to be a "more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." Finally, after rating the degree of functional limitation, the ALJ is to determine the severity of the claimant's mental impairment. 20 C.F.R. § 416.920a(d).

Here, the ALJ found, at step two of the sequential analysis 20 C.F.R. § 416.920, that Claimant suffered from the severe impairment - adjustment disorder with mixed anxiety and depression. Because the ALJ found Claimant suffered from a severe mental impairment, he was obligated to evaluate the severity of Claimant's mental impairments using the technique outlined in 20 C.F.R. § 416.920a. The Court must agree with the Claimant and find that the ALJ failed to comply with the mandates of both 20 C.F.R. § 416.920a and SSR 96-8p. Though the ALJ engaged in a thorough analysis of Claimant's symptoms, signs, and laboratory findings, the ALJ failed to assess in detail by itemizing various functions Claimant's rate of functional limitations using her activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. In fact, when assessing Claimant's RFC, the ALJ only twice mentions any of the four areas by referencing Claimant's testimony that she "could wash dishes, make the bed, dust mop floors, drive, shop, play cards, do crafts, read, prepare simple meals, and pay her bills" (Tr. 13) and "her admitted activities of daily living that include shopping for groceries for over two hours (following which she reported exhaustion rather than severe pain), performing light household chores, preparing meals for herself, her two sons, and her mentally disabled nephew, driving, handling her finances, and taking care of her personal needs without assistance . . . ." (Tr. 15). Though this evaluation is more detailed than the evaluation of her

activities of daily living when determining whether her limitations met a Listing at step three of the sequential analysis, the ALJ failed to specifically analyze any of the other four areas - social functioning; concentration, persistence, and pace; and episodes of decompensation.  The only reference to the other three areas comes when evaluating whether Claimant's impairments or combination of impairments met a Listing.  (Tr. 11).

Accordingly, the ALJ failed to comply with 20 C.F.R. § 416.920a and SSR 96-8p, and the case must be remanded for further evaluation.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED**.  The ALJ did not err by relying on the opinion of Claimant's treating physician Dr. Jones or by failing to include any limitation on concentration, persistence, or pace in the RFC despite finding that Claimant had moderate difficulties maintaining concentration, persistence, and pace.  However, the ALJ erred by failing to specifically explain his reasoning for discrediting the opinions of Claimant's treating physician when determining Claimant's RFC and by failing to comply with 20 C.F.R. § 416.920a and SSR 96-8p, which required that he assess in detail by itemizing various functions Claimant's rate of functional limitations using her activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation.

2.     Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 23, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE